## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Louis J. Wolverton <br> 209 Thrush Court <br> Bushkill, PA 18324 <br><br> Plaintiff, <br><br> v. <br><br> Travel + Leisure Co. <br> f/k/a   Wyndham Destinations, Inc. <br> Orlando office 6277 Sea Harbor Drive <br> Orlando, FL  32821. <br><br> Defendant. | CIVIL ACTION <br><br> JURY DEMAND |

## CIVIL ACTION COMPLAINT

Plaintiff Louis Wolverton, by and through her undersigned counsel, hereby avers as follows:

### I. INTRODUCTION

1. The instant action has been initiated to redress reverse racial discrimination in violation of 42 U.S.C. § 1981.

### II. PARTIES

2. The foregoing paragraphs are incorporated herein as if set forth in full.

3. Plaintiff Louis Wolverton (hereinafter "Plaintiff") is an individual of European-American descent with an address as captioned above.

4. Travel + Leisure Co, Formerly known as Wyndham Destinations Inc. (hereinafter "Travel + Leisure Co. ") is an enterprise of Travel + Leisure Co.  Worldwide U.S.A.

Inc. and is involved in the service of providing lodging, food, and activities for their guests.

5. At all times relevant herein, Travel + Leisure Co. acted through its agents, servants and employees discriminated against Plaintiff due to his race and then retaliated against him through racial discrimination.

### III.   JURISDICTION AND VENUE

6. The foregoing paragraphs are incorporated herein as if set forth in full.

7. The Court may maintain subject matter jurisdiction over the instant case in accordance with 28 U.S.C. § 1331 because it arises under the laws of the United States.

8. The Court may properly maintain personal jurisdiction over Travel + Leisure Co. because Travel + Leisure Co.'s contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Travel + Leisure Co. to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

9. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this judicial district because the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district and because Travel + Leisure Co. conducts business in the Eastern District of Pennsylvania.

### IV.   OPERATIVE FACTS

10. The foregoing paragraphs are incorporated herein as if set forth in full.

11. Plaintiff is a Caucasian American.

12. Plaintiff began employment with Travel + Leisure Co. on or about May 2017 as a Lifeguard and was retained for the following three Summers due to his exemplary respect and skill.

13. Plaintiff was hired hourly to monitor guests and provide for their safety at different pools Travel + Leisure Co. had on their property for guests' enjoyment.

14. Plaintiff was one of several lifeguards over the years and was consistently a model employee.

15. In the Summer of 2019, Plaintiff and a fellow lifeguard saved an Autistic African-American Boy from drowning.

16. On July 18th, 2020, Plaintiff and other lifeguards were threatened by a family of African Americans who failed to keep watch on their child.

17. During the said incident, Plaintiff was respectful and allowed the family into the pool even though they had not booked a valid reservation.

18. This same family was involved in the following incident.

19. At around 6:30 pm, on July 18th, 2020, at the Windham's Shawnee Village pool, lifeguard Jonathan Shanley ("Shanley.") began his 30-minute rotation in the lifeguard chair.

20. Three lifeguards were on duty, one seated in the guard chair, another handling the gate and reservations, and the third in the lifeguard shed rehydrating and cooling off.

21. During Jonathan Shanley's rotation, he noticed a family who had a child with them, aged about 6 to 8 years old.

22. Shanley observed that the child did not swim very well and was clinging to the wall at the deep end, where a sign indicated it was 6 feet deep.

23. Shanley was immediately aware that this child could not stand on the bottom of the pool.

24. Therefore, Shanley politely requested that the parents take the child into the shallow end.

25. At the same time, Shanley tried to complement the child by saying that he did well but needed a bit more practice and that he would feel better if they did it in the shallow end.

26. The shallow end is separated from the deep end by a rope that floats on the water.

27. As Shanley approached, he asked two other children and their parents to move over to the shallow end for the same reasons.

28. They did so without a problem.

29. Shanley then approached the family and requested them to kindly take their child over to the shallow end since the child seemed to have "a bit of trouble swimming."

30. The parents questioned him and were unhappy, but they moved from the 6 feet to about 4 ½ feet deep.

31. This is not the shallow end. The shallow end is marked as 3 ½ feet at its maximum depth and is on the other side of the floating rope.

32. Shanley decided to watch the child and only intervene if there was a dangerous situation.

33. However, the family stared at him for an extended period, which Shanley found threatening and caused him to be hesitant to say anything further.

34. After this, Shanley respectfully requested 5 or 6 more children and their parents to leave the deep end, which they did without incident.

35. Notably, the previous year, the African American child with autism had got into difficulty in the deep end and required C.P.R.

36. It was the Plaintiff who had revived him.

37. Due to this incident, the lifeguards imposed a strict policy of moving children out of the deep end if they did not appear to be solid swimmers.

38. After asking about six children and their parents to move to the shallow end, Shanley continued to watch the child in 4 ½ feet of water.

39. Meanwhile, this family still stared at Shanley in a hostile manner.

40. One of the family members smiled in his direction, and it became clear that he had become the subject of their conversation.

41. Shanley then saw that the child had become distressed, and none of the family had noticed.

42. As Shanley prepared to enter the water, the child reached out and held on to the shoulders of an adult, who had his back to him.

43. Although relieved, Shanley went around to the family for a second time and repeated that he noticed that the child still had trouble swimming, and he wanted him to go to the shallow end

44. This time, Shanley if emphasized, "on the other side of the rope."

45. The family members then questioned him in a hostile manner about why he had needed to ask them a second time.

46. Shanley responded that he just noticed the child was having trouble swimming and probably needed a bit more practice, and that should be done where it was safer, which was on the other side of the rope.

47. While Shanley was explaining, the family tried to cut him off in midsentence.

48. One male member of the family said, "but you already told us this, and we're watching him. Listen, let me explain something to you; we may not look educated to you, but I assure you, we know how to take care of our kid. What makes you think you can tell us what to do with our kid?"

49. Shanley said that all he was trying to do was to keep their child safe.

50. The family told him to get out of their face and laughed.

51. One male family member stopped in front of Shanley and asked, "what's the story?"

52. Shanley replied by giving this member an update.

53. The member then defended Shanley to the family by saying, "he's just doing his job. Relax."

54. The member then turned to Shanley and told him he was a good man.

55. At that point, the Plaintiff arrived to rotate Shanley out of the lifeguard chair.

56. Shanley updated the Plaintiff on the child he had been watching and advised that the Plaintiff watch him because his family had not moved him out of the deep end.

57. Shanley further advised the Plaintiff about other swimmers he had noticed while on guard duty.

58. Shanley started his desk duty at the front of the pool area at 7:00 pm.

59. The family continued to stare at him for the entire 37 minutes he was at the desk.

60. Another lifeguard, Sean Pickett ("Pickett."), relieved Shanley at 7:40 pm and asked if the Plaintiff needed to be rotated.

61. The Plaintiff said he was okay since there were only 20 minutes left until the pool closed.

62. Pickett, however, rotated Shanley to get him out of sight of the family, who had never stopped staring at him.

63. At 8 o'clock, Plaintiff blew his whistle to announce that they were closing the pool.

64. The Plaintiff went inside the lifeguard shed to check on Shanley since he had appeared a little shaken by the incident.

65. Plaintiff then exited the lifeguard shed and again blew his whistle and announced they were closing, and everyone should please leave the pool.

66. A minute or two later, all the family members started to yell at all the lifeguards, but most pointedly at Plaintiff.

67. They had confused Pickett and Plaintiff several times as being the one lifeguard on the stand during the last portion of the day.

68. They also confused Plaintiff and Shanley as the lifeguard who asked their child to move to the shallow end.

69. They insulted the character of all the lifeguards and the Plaintiff responded calmly, "I'm sorry, sir, I would just like to ask you to leave."

70. One man responded, "who the fuck are you to tell me to leave?!"

71. The lifeguards, in answer, referenced their lifeguard shirts and said, "the pool is closing, and we're the lifeguards."

72. One of the men, in his early twenties, pointed to Plaintiff and Shanley and said, "so that's Louis, and this is Johnny Boy."

73. He then kept repeating "Johnny boy, Johnny boy, Johnny boy" as if committing it to memory.

74. Picket was questioned and asked in a hostile manner whether he was the one who told them to 'get out of the fucking pool.'

75. Picket responded that he had not been the one to close the pool or ask anyone to leave.

76. Meanwhile, the women were off to the left and said, "it's not worth it. Let's go."

77. Shanley pointed to the man still saying Johnny boy and told him that he had done nothing to him and had had no issue with him."

78. One of the family members then called the lifeguards "a bunch of racists."

79. Shanley said he was just trying to keep the child safe.

80. The man who defended Shanley before then said, "these two men were just doing their job, but Louis, what makes you think you can tell us to leave?"

81. It was clear that they were confusing Shanley for Plaintiff.

82. The man who had insulted Shanley and called him uneducated said, "listen, I just got done doing ten years, and I don't mind going back; I'll call my boys down to smoke all of you motherfuckers."

83. Shanley said, "we did nothing to you besides trying to keep your kid safe and our job. I have to ask you to leave, sir."

84. The Plaintiff also told the family it was time to leave and that they could speak with management.

85. At this point, the family began to leave, and shortly thereafter, security walked in, and the lifeguards updated them.

86. The lifeguards then closed the pool as usual for the night, locked up, and headed upstairs to clock out and to brief the front desk on what had just happened.

87. The lifeguards requested that a security detail be posted at the pool for the next day.

88. The following morning, Shanley opened the pool at 7.30 am and, once more, requested security at the pool gate.

89. The front desk promised to send someone down but never did.

90. At noon, the Plaintiff clocked in and immediately climbed onto the lifeguard stand. At the same time, Shanley went into the lifeguard shed to give his Defendant Manager a report of the previous day's events.

91. While Plaintiff was on the lifeguard stand, two members of the African-American family from the day before went directly past the front desk, without any reservation, and walked right up to the Plaintiff in the guard chair and started to take pictures of him and then a video.

92. During the video, they yelled, "this is the man who said he wants to kill all the black people."

93. Three hours later, the Plaintiff's picture was posted on Travel + Leisure Co.'s Facebook page.

94. The Travel + Leisure Co. post stated that "this did not happen to me personally. I don't sit back and wait until it happens to me because it can and will. So, we have reservations for Shawnee Resorts next weekend. I have family there this weekend, and he said, "I wish these BLACK PEOPLE WOULD GET THE "F" OUT THE POOL."

95. The posting specifically identified the Plaintiff by name and posted his photograph.

96. Travel + Leisure Co.'s post, labeling the Plaintiff a racist, went viral.

97. The Plaintiff was, very shortly after Travel + Leisure Co.'s posting online, threatened, vilified, and insulted by numerous persons.

98. Plaintiff's full name and photograph while on the lifeguard stand were reposted countless times with a banner across his enlarged photograph, in block capitals, allegedly quoting him as saying, "I HOPE THESE BLACK PEOPLE GET THE FUCK OUT OF THE POOL."

99. Underneath the banner was the Plaintiff's full name and the words' Life Guard.'

100. The banner, Plaintiff's forgoing alleged quote, and color photographs were all part of Travel + Leisure Co.'s post.

101. Following this, Plaintiff had several conversations with the Defendant's General Manager at the time, Richard, about the incident, in which General Manager and

Human Resources guaranteed that Plaintiff would have paid time off till he felt safe, that they would protect him and help quash this issue, that they were aware he had not done what he was accused of, and further that his job was not at stake.

102. Plaintiff was also told by other office and front desk workers that they knew he did not utter these words and that it would be okay.

103. Plaintiff spoke to Law Enforcement in Stroudsburg, Pennsylvania, and met with Pickett, Shanley, and Management of the Defendant.

104. During said meeting, the Defendant refused to press charges or give information about the Travel + Leisure Co. to Officer.

105. After the meeting, Plaintiff was guaranteed that he was safe and would be given paid time off, and they would make this right.

106. Plaintiff, during this time, was notified that his admission into Law School was under review because he had been labeled a racist.

107. Plaintiff was so distraught and was going to contact the management of Defendant so they could give credible information to the law school; however, Defendant contacted him first.

108. On or about July 22$^{nd,}$ 2020, Defendant informed Plaintiff that his employment was terminated due to his lack of hospitality.

109. The next day Plaintiff went in to retrieve his belongings from Defendant's premises.

110. Plaintiff spoke with his old Supervisor and Manager, who did not know he had been discharged.

111. Plaintiff's old coworkers also did not know.

112. Shanley and Pickett said that before Plaintiff's termination, Defendant's Management began asking if Plaintiff had ever been involved in inappropriate, discriminatory conduct, which they all reported in the negative.

113. Even after Travel + Leisure Co.'s Facebook post was compulsorily removed by Facebook, those who had posted protested online that the post should not have been removed.

114. Even with the post's removal by Facebook, the post was nonetheless reposted countless times.

115. Plaintiff became and remained the immediate subject of online conversations, where his character was maligned, his life was threatened, and he was viciously insulted.

116. Plaintiff had to explain the entire circumstances to defend himself from severe disciplinary action by the University, which had accepted him as a student.

117. The Plaintiff never made the racial slur and/or slurs Travel + Leisure Co. had accused him of.

118. The accusation that he did make such a slur, or words like it, is false.

119. The Plaintiff has never uttered a racial slur.

120. The Plaintiff has discussed with Shanley, who is Puerto Rican, many aspects of the racial injustice facing African Americans and other minorities.

121. Plaintiff's coworkers were granted opportunities to continue work not as lifeguards until they felt safe again, which Plaintiff was denied due to his race and subject of the Facebook post.

122. Plaintiff was unlawfully terminated from Defendant's employ on or about July 22nd, 2020.

## COUNT I
## REVERSE RACE DISCRIMINATION
## VIOLATIONS OF 42 U.S.C. § 1981

123. The foregoing paragraphs are incorporated herein as if set forth in full.

124. At all times relevant herein, Plaintiff maintained or sought to maintain a contractual relationship with Defendant.

125. At all times relevant herein, Defendant acted by and through its agents, servants, and employees to intentionally discriminate against Plaintiff due to his race (Caucasian) and thereby deny him the benefits of the contractual relationship he had entered or sought to enter with Defendant.

126. Plaintiff was treated in a disparate manner in his contractual employment with Defendant due to his race.

127. Shanley, a Puerto Rican, was treated more favorably than the Plaintiff.

128. The Plaintiff was intentionally discriminated against because of his race, and that discrimination was sufficiently severe to adversely affect him just as it would detrimentally affect any reasonable person in like circumstances.

129. Plaintiff was retaliated against by being terminated from Defendant's employment due to his race

130. Alternatively, pursuant to Fed. R. Civ. P. 8 (d)(2), Plaintiff was subjected to unlawful reverse race discrimination and retaliation based on a Cat's Paw theory.

131. Plaintiff has suffered damages as a direct result of Defendant's unlawful actions.

## *AD DAMNUM* CLAUSE/PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Shawnee and that it enter an Order providing that:

A. Travel + Leisure Co. is to be permanently enjoined from discriminating against Plaintiff on any basis forbidden by 42 U.S.C. § 1981 and any other applicable federal and state law.

B. Travel + Leisure Co. is to be prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating against employees based on their race and is to be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

C. Travel + Leisure Co. is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Travel + Leisure Co.'s illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, travel, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date he first suffered discrimination at the hands of Travel + Leisure Co. until the date of the verdict;

D. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to her by Travel + Leisure Co.'s actions;

E. Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Travel + Leisure Co. for its willful, deliberate, malicious, and outrageous conduct and to

        deter Travel + Leisure Co. or other employers from engaging in such misconduct in the future;

F.    Plaintiff is to be accorded any, and all other equitable and legal relief as the Court deems just, proper and appropriate;

G.    Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

H.    Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law.

Respectfully submitted,

KOLMAN LAW PC

By:    /s/ Timothy M. Kolman, Esquire

Timothy M. Kolman
Attorney for Plaintiff

KOLMAN LAW PC
414 Hulmeville Avenue
Penndel, PA  19047

(215) 750-3134

July 20, 2022

4883-5656-4266, v. 1